### UNITED STATES v. CURTIS.

*(Circuit Court, S. D. New York. July 20, 1882.)*

1. CIVIL SERVICE—POLITICAL ASSESSMENT—PROHIBITORY ACT CONSTRUED.

   Under the act of congress which prohibits " all executive officers or employes of the United States not appointed by the president, by and with the advice and consent of the senate," from " requesting, giving to, or receiving from any other officer or employe of the government any money or property or other thing of value for political purposes," the person indicted can only be tried for doing the thing which the statute prohibits; and unless this of itself, isolated from all its concomitants, can be competently made a crime by congress, the statute is nugatory.

2. SAME—GOVERNMENT OFFICIALS—POWER OF CONGRESS.

   Congress may lawfully prescribe all needful regulations for the discipline of government officials, and may declare what infractions of discipline shall be treated as criminal offences, and it may prohibit co-operation between officials in the raising of funds for political purposes.

3. SAME—LEGISLATIVE DISCRETION.

   In executing its power to prohibit acts of officers or employes which are incompatible with the proper discharge of their duties, or which impair the efficacy or tend to demoralize the public service, congress must exercise its judgment and discretion in determining what acts are or are not of such a pernicious character and tendency, and it is only when congress has palpably transgressed the limits of its discretion that the judicial department will intervene. It is sufficient to justify the exercise of legislative discretion if the prohibited acts tend to introduce interests which disturb the just equipoise of official relations.

Motion for New Trial and Arrest of Judgment.

The indictment against the defendant contained 11 counts. Upon the first and eighth he was convicted, and acquitted upon the others. To arrest judgment, or obtain a new trial, upon the counts mentioned, he filed the present motions.

The first count charged him with "receiving" five dollars "in money" from Peter Vogelsang, in October last, "for political purposes," to-wit, for the use of the Republican state committee, of which Curtis is alleged to have been a member, in the then-pending campaign, both Vogelsang and Curtis being (as it is alleged) then "employes" of the United States, not appointed by the President with the advice and consent of the senate.

The eighth count charges the like reception by Curtis, from Charles Treichel, of a certain "thing of value," to-wit, the bank check of Mr. Treichel for $100 "payable to the order of him, the said Newton Martin Curtis," for the use aforesaid. There is the same allegation that each of these persons were then such "employes" of the United States, it being stated that Mr. Treichel was an "auditor" at the custom-house.

This indictment was found under the act of August 15, 1876, *c.* 287:

"Sec. 6. That all executive officers or employes of the United States, not appointed by the president, with the advice and consent of the senate, are prohibited from requesting, giving to, or receiving from any other officer or employe of the government any money or property or other thing of value for political purposes.

"And any such officer or employe who shall offend against the provisions of this section shall be at once discharged from the service of the United States.

"And he shall also be deemed guilty of a misdemeanor, and, on conviction thereof, shall be fined in a sum not exceeding five hundred dollars." 19 St. 169, 1 Supp. Rev. St. 245.

*S. L. Woodford,* U. S. Dist. Atty., and *Everett P. Wheeler,* for the United States.

*Edwin B. Smith,* for defendant.

### BRIEF OF DEFENDANT.

\*  \*  \*  \*  \*  \*  .  \*

The constitution contains no clause and no grant of power upon which such a law, passed for such a purpose, can rest.

Certainly the authority for it is nowhere expressly given, nor does careful scrutiny reveal to us anything from which it can be derived, even by the most strained inference.

\*  \*  \*  \*  \*  \*  \*  \*

The congress of the United States is delegated with very limited legislative powers,—to do nothing which the constitution does not

first sanction. *Calder* v. *Bull*, 3 Dall. 387; *People* v. *Draper*, 25 Barb. 359; *Mason* v. *Wait*, 4 Scam. 134.

By reason of these limitations the legal presumption is that any cause is without the federal criminal jurisdiction until shown to be within it. *Turner* v. *Bank of North America*, 4 Dall. 11; *State* v. *Sanford*, 1 Nott & McC. 512.

\*　　\*　　\*　　\*　　\*　　,　　\*

It was "in order" to attain the great objects mentioned in this preamble [to federal constitution] that "the legislative powers herein granted"—and none other—were "vested in a congress of the United States," and these only for national purposes. 92 U. S. 549, 550, cited *infra*.

Article 1, § 4, of the constitution contains the first grant of legislative authority. It allows, to a limited extent, a revisory control over and amendment of the regulations made by the states with reference to the election of senators and representatives in congress. Authority over elections is circumscribed within the limitations of this section. There is none given over preliminary "campaigns."

The three succeeding sections (5, 6, and 7) relate merely to the forms of procedure in congress, the methods of organization, the compensation and privileges of its members.

The eighth section contains practically an enumeration of all the general, independent powers of legislation conferred upon congress. 25 Barb. 359, cited *ante*.

\*　　\*　　\*　　●　　\*　　\*　　\*　　\*

It will be perceived that each grant of legislative power in section 8 is based upon some subject-matter of appropriate federal cognizance, and not upon the existence of any relation of individuals to the government, with the single exception of those enrolled in the land or naval forces.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

The subject-matter sets the bounds, which congress may not pass. No act committed within a state can be made an offence against the United States, "unless it have some relation to the execution of a power of congress, or to some matter within the jurisdiction of the United States. *U. S.* v. *Fox*, 95 U. S. 672; *Tennessee* v. *Davis*, 100 U. S. 260, 261.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

An examination of the statutes, from the crimes act of April 30, 1790, (1 St. 112–119,) down, justifies me in emphasizing the asser-

tion that this act of August 15, 1876, *c.* 287, § 6, is the solo instance in the entire legislation of the country of basing a conviction of a crime upon the mere fact of the relation of the offender or the party injured to the United States, without regard to the effect of that act upon any subject-matter entrusted to the guardianship of the United States. See 1 Abb. U. S. Court Practice, *c.* 5, tit. "Crimes," pp. 460, 461.

In every other instance the purpose has been to guard and promote the interest of the United States. If, incidentally, the functionary (mail carrier, for instance) is protected in the discharge of his duty, it is simply in order that he may discharge the duty devolved upon him, not that the individual be exempted from physical pain or mental annoyance. *Osborn* v. *U. S. Bank,* 9 Wheat. 865; *U. S.* v. *Harvey,* 8 Law Rep. 77; *U. S.* v. *Parsons,* 2 Blatchf. 104, 108; *U. S.* v. *Gay,* 2 Gall. 359; *U. S.* v. *Hart,* Pet. C. C. 390; *U. S.* v. *Kirby,* 7 Wall. 482; *U. S.* v. *Sander,* 6 McLean, 598, 601.

＊　　＊　　＊　　＊　　＊　　＊　　＊　　＊

It is only laws "necessary and proper" to effect constitutional purposes that congress is empowered to enact.

It cannot determine conclusively for itself the existence of the necessity for, nor the propriety of, its legislation; otherwise, its jurisdiction would be practically unlimited, instead of being restricted within comparatively narrow bounds.

When, by the passage of a law, on the one hand, and refusal to recognize its commands, upon the other, the issue of its necessity and propriety—and, consequently, of its validity—is raised, it is one for judicial investigation and determination. Cooley, Const. Lim. 44, 45, and notes; Leiber, Civ. Lib. & Self-Gov. 162–164; De Tocqueville, Dem. in Am. *c.* 6; Story, Const. § 1842; *Marbury* v. *Madison,* 1 Cranch, 176–178; *Osborn* v. *U. S. Bank,* 9 Wheat. 89; *De Chastellux* v. *Fairchild,* 15 Pa. St. 18, per *Gibson,* C. J.; *Bates* v. *Kimball,* 2 D. Chip. 77; *Van Horne* v. *Dorrance,* 2 Dall. C. C. 309; *Bowman* v. *Middleton,* 1 Bay, 252; *Grimball* v. *Ross,* Charlt. 175; *Bebee* v. *State,* 6 Ind. 501 *et seq.*; *Cronise* v. *Cronise,* 54 Pa. St. 263, top, affirming *Jones* v. *Jones,* 12 Pa. St. 356–7; *McCauley* v. *Brooks,* 16 Cal. 39 *et seq.*, per *Field,* C. J.; *Bayard* v. *Singleton,* 1 Martin, (N. C.) 42. See, also, Mr. Webster's speech on the Independence of the Judiciary, 3 Webst. Works, 29; similar language used in *Whittington* v. *Polk,* 1 Har. & J. 243.

The legislature no more represents the sovereignty of the people than either of the other departments. All equally derive their

authority from the same high source.  *Bailey* v. *Phila., etc., R. Co.* 4 Har. (Del.) 402–403.

Chief Justice Marshall's authoritative definition of the above-quoted phrase is, of course, familiar.  The summing up of his exhaustive discussion is: "Let the end be legitimate; let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." *McCulloch* v. *Maryland*, 4 Wheat. 421.

In his Commentaries, Story says of this case, and of the language of the constitution: "It requires that the means should be, *bona fide*, appropriate to the end." 2 Story, Const. § 1253 *et seq.*

The inquiry before us, then, is: Does this statute seek, by appropriate means, adopted in good faith for that purpose, an end legitimate to be accomplished by federal legislation?

\*     \*     \*     \*     \*     \*     ...     \*

First, then, as to the end sought.  What this is must be determined from the terms of the statute itself, irrespective of theory; because "nothing is more common than for a law to effect more or less than the intentions of the persons who framed it; and it must be judged of by its words and sense, and not by any private intentions of the members of the legislature." 2 Story, Const. § 1268, last sentence; *Atty. Gen.* v. *Sillem*, 2 Hurl. & C. 530, 531, per *Bramwell*, B.; *Aldridge* v. *Williams*, 3 How. 24; *State Tonnage Tax Cases*, 12 Wall. 217.

Just as it reads, the plain and only purport of this statute is to forbid pecuniary co-operation among federal officers and employes of inferior grade—numbering (we are told) nearly 100,000 citizens —for any political purpose whatsoever, national, state, municipal, or other.  A political purpose I understand to be a design to effect the government, or some branch or department or subsidiary agency of it, in its administration, composition, or policy, whether by a change of men or of measures.

"All political power is inherent in the people;" *i. e.*, in the people within the limits of whose sovereignty, determined territorially, or otherwise, that power is to be exercised, and to which it pertains. In framing the federal constitution, the people delegated to the nation so much power as they judged sufficient—whether so in fact, or not, (92 U. S. 549,)—for the performance of its functions.  The residue, with certain very important restrictions in their own behalf, they confided to the state governments.  The boundary between the several

states is territorial; between each of them and the nation it is subjective; yet, to the judicial perception, it is as well defined "as if the line of division was traced by landmarks and monuments visible to the eye." 21 How. 516. Whatever arbitrary power may attempt or accomplish, legally the barrier between the two jurisdictions is impassable, although the same persons may be subject to both. The "political purposes" of each are to be declared, attained, or sought only by its people; and, until our frame of government is changed, the people of the United States can constitutionally entertain and execute no purpose unless it relate to a subject of national jurisdiction.

In his Philosophy of Law, §§ 17, 164, 169, etc., Broom states the primary test of criminalty to be, whether or not the act in question is prejudicial to the public. It goes, without saying, that he means the public whose rights it affects. Except as the citizens are concerned in the execution of the few delegated powers, the United States have no public, outside the District and territories, etc. Elsewhere, and as to all other matters, the people are the state's public. This dual relation must be constantly borne in mind, in considering the extent of the power of national legislation. It is entirely ignored in this statute. Read *U. S.* v. *Cruikshank*, 92 U. S. 549–551. Thus, every citizen is held obedient to two sovereigns. One sovereignty, however, can command only as to a few highly important matters; as to everything else its laws should be silent or unheeded. As to those matters its injunctions are equally imperative to every citizen, whether holding official relation to it or not. True, there are some crimes which, as technically defined, none but an agent can commit; for instance, embezzlement, which in another would be larceny. Yet the jurisdictional element (*i. e.*, the misappropriation of government property) is the same in each case. Many similar instances might be cited.

The sum and substance of it all is, however, that the United States, properly, only defines and punishes, as criminal, such acts as affect the proper discharge of its own functions. Evidently the present law is not intended for any such purpose. Accepting the statements of its advocates, its end is the protection of the individual and not of the function. This is not "legitimate." This law has no tendency to facilitate the collection of revenue; the settlement or sale of public lands; the safety of the currency; the prompt and proper delivery of the mails, or adjustment of accounts; in short, any governmental purpose of the Union. It is purely personal in its design and

operation. If the giving and receiving of value for political purposes is arbitrarily forbidden, and not in order to protect the officer or employe, it is still more illegitimate, because it then loses all pretence of being in the interests of justice and freedom of action.

    \*       \*       \*       \*       \*       \*       \*       \*

It is the province of the state to regulate the manner in which all property shall be acquired, held, used, and transferred within her borders, whether by deed, will, gift, or otherwise. 2 Kent, Comm. 437. There is as little right in the general government to regulate gifts within this state as there is to declare a general law as to making other contracts. Without the consent of New York, the United States cannot even accept for itself the gift of property lying within our jurisdiction, though to do so would directly tend to reduce the public debt, diminish taxation, aid the common defence, and promote the general welfare. *U. S.* v. *Fox*, 94 U. S. 315; 52 N. Y. 530.

    \*       \*       \*       \*       \*       \*       \*       \*

Concede all the hardship upon the subordinate in office, and all the evils incident even to the "levying of political assessments," yet the penal legislation of the federal government cannot afford the remedy, although dismissal from service may be decreed. If the state of things assumed to exist, and against which this enactment is supposed to be directed, is *contra bonos mores*, yet we must remember the United States is not *censor morum*, except to the extent mentioned.

In *Wynehamer* v. *People*, 13 N. Y. 386, *Comstock*, J., quotes and italicizes this sentence from Blackstone: "Besides, *the public good is in nothing more essentially interested than in the protection of every individual's private rights, as modelled by the municipal law.*"

The police power regulates "the intercourse of citizen with citizen." Cooley, Const. Lim. \*572; 1 Dill. Mun. Corp. § 141; *Com.* v. *Alger*, 7 Cush. 82, 84, 86.

"In the American constitutional system the power to establish the ordinary regulations of police has been left with the individual states, and it cannot be taken from them, either wholly or in part, and exercised under legislation of congress." Cooley, Const. Lim. 713 of last edition, citing *License Tax Cases*, 5 Wall. 471; *U. S.* v. *De Witt*, 9 Wall. 41; *Patterson* v. *Kentucky*, 97 U. S. 504; *U. S.* v. *Reese*, 92 U. S. 214; *Railroad* v. *Fuller*, 17 Wall. 568, top; *U. S.* v. *Cruikshank*, Id. 542; *Munn* v. *Illinois*, 94 U. S. 124, 125; *Railroad* v. *Husen*, 95 U. S. 470, 471; *U. S.* v. *Fox*, Id. 672; *Beer Co.* v. *Massachusetts*, 97 U. S. 25; *Fertilizing Co.* v. *Hyde Park*, Id. 659; *People* v. *Draper*, 25

Barb. 374; S. C. on app. 15 N. Y. 562, 563; *Gibbons* v. *Ogden,* 9 Wheat. 203; *N. Y.* v. *Miln,* 11 Pet. 133–4, 139; *Slaughter-house Cases,* 16 Wall. 62, citing *Thorpe* v. *Railroad,* 27 Vt. 149. The state's reserved right to regulate the conduct (*inter sese*) of her citizens is of too vital importance to be argued away by forced construction or strained inference. "No interference by congress with the business of citizens transacted within a state is warranted by the constitution, except such as is strictly incidental to the exercise of powers clearly granted to the legislature," (5 Wall. 471, top;) *i. e.* "clearly incidental" to an express power; if not expressly given, (9 Wheat. 204, top.)

The assistant district attorney is made to say, in the speech attributed to him, that the power to pass this law is fairly deducible from that "to lay and collect taxes." How any more than from that to establish post-offices and post-roads, or any other of the 17 grants, is not stated, nor can I conjecture. Certainly it *is* not "strictly incidental" to taxation.

Of a much more plausible deduction, the United States supreme court declared, through its late chief justice: "This consequence is too remote and too uncertain to warrant us in saying that the prohibition is an appropriate and plainly-adopted means for carrying into execution the power of laying and collecting taxes." *U. S.* v. *De Witt,* 9 Wall. 44. The statute there drawn in question was section 29 of the internal revenue act of March 2, 1867, *c.* 169, (14 St. 484,) punishing the sale of taxable oil inflammable at less than 110 deg. Fahrenheit. It was held to be a mere police regulation, not within congressional authority, and void. Id. A like statute by a state held constitutional, although the oil was made under a United States patent granted De Witt, exemption from such state legislation not being considered fairly deducible from the patent, or the power under which it issued. *Patterson* v. *Kentucky,* 97 U. S. 501, 503 *et seq.,* affirming *Patterson* v. *Com.* 11 Bush, 311; *Veazie* v. *Moore,* 14 How. 574, 575.

The right and duty of the state to guard its citizens from moral danger (and to determine its existence and cause) is the same as it is with regard to physical perils.

In addition to the numerous citations before given, decisions analogous to that cited from 97 U. S. 501 *et seq.* have repeatedly been announced both in the federal and state courts, under the prohibitory liquor laws of the states, and the United States laws imposing license fees or special taxes. *License Cases,* 5 How. 573–632; *Bartemeyer* v. *Iowa,* 18 Wall. 129–141.

Congress can prescribe a uniform rule of naturalization, but not for the conduct of a naturalized citizen. It can declare how he can become a citizen, but not his rights as a citizen. It cannot control his whole life because made a citizen under its legislation. Neither can it, upon like ground, control the ordinary acts of one holding a federal office. *Osborn* v. *U. S. Bank*, 9 Wheat. 827, 828.

The police power is one which the state cannot surrender. To permit it, would be to allow the legislature to give up the functions for the discharge of which the state exists. *Beer Co.* v. *Mass.* 97 U. S. 33, middle; *Boyd* v. *Alabama*, close of opinion, per *Field*, J.; 94 U. S. 650; *Met. Bd.* v. *Barrie*, 34 N. Y. 667, bottom, and 668, top.

However important the object, real or assumed, of this legislation, "yet it is equally important that there be no usurpation of jurisdic tion." *U. S.* v. *Cahill*, 3 Crim. Law Mag. for March, 1882, 197, cited *infra*.

*       *       *       *       *       *       *       *

Of all matters pertaining to state affairs, "pending campaigns" and elections are those with which the general government has the least right to meddle, because they are the corner-stones of an independent, political organization.

Vindicating the fourth section of the first article of the Federal Constitution, Hamilton writes, with the emphasis of italics:

"Its propriety rests upon the evidence of this plain proposition, that *every government ought to contain in itself the means of its own preservation.*" [He proceeds to add in a subsequent paragraph:] "Suppose an article had been introduced into the constitution empowering the United States *to regulate the elections for the particular states;* would any man have hesitated to condemn it, both *as an unwarrantable transposition of power*, and as a premeditated engine for the destruction of the state governments? The violation of principle, in this case, would have required no comment; and to an unbiased observer, it will not be less apparent in the project of subjecting the existence of the national government, in a similar respect, to the pleasure of the state governments. An impartial view of the matter cannot fail to result in a conviction that *each*, as far as possible, *ought to depend on itself* for its own preservation." Federalist, No. 59.

"It is clear that no federal statute can interfere with voters except at an election for representatives in congress, and then only as to their protection in voting for representative in congress. Hence, it is essential to be charged in the indictment that, 'at an election for representative,' etc., the offence was committed; and it is not sufficient to allege that 'at an election at which a representative was voted for,' etc. It may be that the election in question

was for some other purpose over which the federal government had no control, and with which it had no right to interfere." *U. S.* v. *Cahill,* per *Treat, J.,* in 3 Crim. Law Mag., for March, 1882, pp. 196–198.

Interference with a "pending campaign" is obnoxious to the same objection as to meddling with a state election. Neither the United States nor any state can constitutionally pass such a law as this, because it violates natural right. Speaking of these rights, *Cooley, J.,* says: "There are some things too plain to be written," even in a constitution. 24 Mich. 107, cited *infra.*

"Written constitutions sanctify and confirm great principles, but the latter are prior in existence to the former." 2 Webst. Works, 392; 1 Bl. Comm. 124; 2 Story, Life, 278, letter to Dr. Lieber; *Calder* v. *Bull,* 3 Dall. 388, top; *Wilkinson* v. *Leland,* 2 Pet. 657.

In *Bartemeyer* v. *Iowa,* 18 Wall. 132, middle, *Miller,* J., mentions, as existing outside of constitutions, those "general principles supposed to limit all legislative power." See, too, *Merrill* v. *Sherburne,* 1 N. H. 213, near top, per *Woodbury,* J.; *People* v. *Sup'rs,* 4 Barb. 74–5; *Benson* v. *Mayor,* 10 Barb. 244–5; *Powers* v. *Bergen,* 6 N. Y. 366–7; *Goshen* v. *Stonington,* 4 Conn. 225. Especially see *People* v. *Hurlburt,* 24 Mich. 107 *et seq.,* cited *supra.* Also, read *Lee* v. *State,* 26 Ark. 265 *et seq.*

Not only does this kind of legislation assail that entire freedom of political action which is the very fundamental idea of republican institutions,—upon which nation, states, and constitutions rest,—but it violates the spirit (and, indeed, the letter) of the declaration in the first amendment, that freedom of speech and of the press shall not be abridged. U. S. Const. Amend. 1. Look at the language of this amendment:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech or of the press; and the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

Indubitably, it would be a violation of this provision for congress to enact that none of the 100,000 government officials should give anything to the Methodist church, (for instance,) though left free to hold such religious tenets as they pleased, and to preach and pray accordingly. The exercise of religion is not free unless every one can give of his means freely, without control, in its support, and to promulgate its doctrines. In like manner, freedom of speech and of the press is abridged if every citizen cannot, at will, contribute to

cause the speech to be made in a suitable place, and, when made, that it may be disseminated to accomplish the "political purposes" for which it is intended. Freedom of the press is not simply the right to print. It is, pre-eminently, the right to publish, which necessarily involves the right to receive aid from whomsoever has the means and desire to give, that the publication may be effected. So the right to assemble includes the right to hire Faneuil Hall, or any other convenient place, in which to hold the meeting, and the right of every citizen who makes one of that assembly, or chooses to aid its object, (political or other,) to give towards the hire of the hall and other expenses.

"The right to life includes the right of the individual to his body, in its completeness, and without dismemberment; the right to liberty, the right to exercise his faculties, and to follow a lawful avocation for the support of his life; the right of property, the right to acquire, possess, and enjoy it in any way consistent with the equal rights of others, and the just exactions and demands of the state." *Bertholf* v. *O'Reilly*, 74 N. Y. 515, middle, per *Andrew*, J.

A more severe blow at free discussion was never dealt than this law, which says of 100,000 citizens that they shall not give, at their own good pleasure, to have it carried on; and the deadly stroke is given in the name of political liberty, and under the banner of "reform!"

This law is void because it overthrows that equality of rights which belongs to every citizen. It sets a seal of inferiority upon a class, denying to all whom it embraces a privilege which every other person in this broad land possesses.

In terms, amendment 14 is restrictive upon the states, as the first nine were upon the United States; yet of these it was well said that they "are declaratory of the great principles of civil liberty, which can be infringed neither by national nor the state governments." *Campbell* v. *State*, 11 Ga. 353.

The United States was bound to respect the equal rights of the citizen before the late amendments were adopted.

In 1818 Levi Woodbury, who had recently taken his seat upon the bench of his native state, declared that "an act which operates on the rights or property of only a few individuals, without their consent, is a violation of the equality of privileges guarantied to every subject." *Merrill* v. *Sherburne*, 1 N. H. 212, cited *ante*.

Denying to a specified class the right to fish in the waters of the state is depriving that class of the equal protection of the laws. *In re Ah Chong*, 2 FED. REP. 737, *Sawyer*, C. J. See opinion of same able

judge, *In re Tiburcio Parrott*, 1 FED. REP. 481. In this last case those in which the "privileges and immunities" of citizens have been discussed are cited; especially the familiar passage from Mr. Justice Washington's opinion in *Corfield* v. *Coryell*, 4 Wash. C. C. 371, adopted in *Ward* v. *Maryland*, 12 Wall. 430, and in *The Slaughter-house Cases*, 16 Wall. 76.

Upon the next page the court say it was not the purpose of the fourteenth amendment to transfer the security and protection of all the civil rights mentioned from the states to the federal government. 16 Wall. 77. If not transferred for protection, they cannot be (as to 100,000 citizens) for the purposes of invasion and abridgment. Whatever rights citizens have, the fourteenth amendment says shall be shared equally, (Id;) and this statute does not comply with that requirement.

In his powerfully-reasoned dissenting opinion, *Field*, J., asserts for every citizen "the right to pursue the ordinary avocations of life without other restraint than such as affect all others, and to enjoy equally with them the fruits of his labor." 16 Wall. 90, middle. "To enjoy equally" means to use just as unrestrainedly as every other citizen.

The same distinguished jurist, in his opinion in the *Queue Case*, as courageous as it is able, after referring to legislation against the Catholics, etc., says:

"But in our country hostile and discriminating legislation by a state against persons of any class, sect, creed, or nation, in whatever form it may be expressed, is forbidden by the fourteenth amendment to the constitution." [Cited.] "The equality of protection thus assured to every one while within the United States, from whatever country he may have come, or of whatever race or color he may be, implies not only that the courts of the country shall be open to him on the same terms as to all others for the security of his person or property, the prevention or redress of wrongs, and the enforcement of contracts, but that no charges or burdens shall be laid upon him which are not equally borne by others; and that, in the administration of criminal justice, he shall suffer for his offences no greater or different punishment." *Ho Ah Kow* v. *Nunan*, 5 Sawy. 562.

I will add that he shall suffer no punishment for an act which in another is justifiable and commendable.

In another paragraph Judge Field observes:

"It is certainly something in which a citizen of the United States may feel a generous pride, that the government of his country extends protection to all persons within its jurisdiction, and that every blow aimed at any of them,

however humble, come from what quarter it may, is 'caught upon the broad shield of our blessed constitution and our equal laws.'" Id. 563.

"What government owes to society, and all it owes, is the impartial administration of equal and just laws." Sharswood, Prof. Ethics, 20.

In some instances, where the general terms of a law might seem to embrace an area beyond the legislative jurisdiction, the courts have narrowed the statute by construction to persons and things which might properly be made amenable to it. This was done with regard to the acts requiring stamps to be placed upon judicial process, and making unstamped instruments inadmissible in evidence. They were generally held applicable to federal tribunals; some holding they were not intended to apply to state courts, and others that congress could not extend them beyond the national courts. *Carpenter* v. *Snelling*, 97 Mass. 452, *Moore* v. *Quirk*, 105 Mass. p. 51, § 2; *People* v. *Gates*, 43 N. Y. 40.

In the before-cited case of *U. S.* v. *Cahill*, *Treat*, J., observed:

"It would hardly be contended that, because congress may pass a law to control congressional elections, and protect voters against unlawful or violent interference with the right to vote for congressional representatives, therefore, whatever occurred at an election which did not interfere with such a right must be considered within the terms of the act, because the words are general, viz.: 'Unlawfully prevents any qualified voter of any state * * * from freely exercising the right of suffrage,' etc. The language must necessarily be so construed as to confine the provisions of the statute within constitutional limits." 3 Crim. Law Mag. 197.

That cannot be done here—*First*, because the statute does not, like Rev. St. § 5511, under which the last-cited case arose, confine itself to "any election for representative or delegate to congress," nor, indeed, to an election at all; and, *second*, because the indictment does not allege the transaction to be with reference to such, or to any election or other subject-matter of federal jurisdiction.

Congress cannot say that certain officers and employes shall not give or receive any money or thing for "political purposes" generally, and leave the courts to construe it to mean "any federal purpose." If this were competent, the indictment does not allege nor the proof show anything of the kind. But it is not competent. It is not possible to separate the unconstitutional from the constitutional, if any part could be deemed so. 92 U. S. 221.

"It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained and who should be set at large.

This would, to some extent, substitute the judicial for the legislative department of the government. The courts enforce the legislative will, when ascertained, if within the constitutional grant of power. Within its legitimate sphere congress is supreme, and beyond the control of the courts; but if it steps outside of its constitutional limitations, and attempts that which is beyond its reach, the courts are authorized to, and when called upon in the due course of legal proceedings must, annul its encroachments upon the reserved powers of the states and the people. To limit this statute in the manner now asked for would be to make a new law, not to enforce an old one. This is no part of our duty." *U. S.* v. *Reese*, 92 U. S. 221.

"It is quite possible that the framers of the statute intended it to apply only to acts committed in contemplation of bankruptcy; but it does not say so, and we cannot supply qualifications which the legislature has failed to express." *U. S.* v. *Fox*, 95 U. S. 672–3.

The history of the times shows that the legislative power is constantly striving to overpass the bounds deliberately set to their authority; and that the people are compelled to place new barriers against evil legislation, and to call frequently upon the courts to see they are not scaled or overthrown. Commenting upon the report of the *Queue Case*, 18 Am. Law Reg. 676, Judge Cooley says: "It is a matter of every-day observation that legislatures are accustomed to treat constitutional limitations as imposing no moral obligation whatever upon their members;" and there is therefore a constant effort to evade rather than to observe them. 18 Am. Law Reg. 684.

Possibly Judge Cooley might (or might not) omit or soften his language if it were intended to appear in the Michigan Reports; but in the preface to the second edition of his work on Constitutional Limitations he uses the like. After remarking that his book was originally "written in full sympathy with all those restraints which the caution of the fathers had imposed upon the exercise of the powers of government" * * * and "endeavored to point out that there are on all sides definite limitations which circumscribe the legislative authority, independent of the specific restrictions which the people impose by their state constitutions," he adds:

"Further reflection has only tended to confirm him in his previous views of the need of constitutional restraints at every point where agents are to exercise the delegated authority of the people; and he is gratified to observe that in the judicial tribunals the tendency is not in the direction of a disregard of these restraints."

Another distinguished jurist writes:

"It is worth while to remark that in every new and amended state constitution the bill of rights spreads over a larger space; new as well as more stringent restrictions are placed upon legislation. There is no danger of this being

carried too far, as Chancellor Kent appears to have apprehended that it might be. There is not much danger of erring upon the side of too little law. The world is notoriously too much governed. Legislators almost invariably aim at accomplishing too much. Representative democracies, so far from being exempt from this vice, are, from their nature, peculiarly liable to it." Sharswood, Prof. Ethics, 22, 23.

In President Woolsey's edition (A. D. 1875) of Dr. Lieber's Civil Liberty and Self-Government, an editor's note to page 161 observes that "specific checks on legislative power are coming more and more into use. The people are beginning to distrust the legislatures, as they formerly did the executives." They should distrust *both*. "The price of liberty is eternal vigilance."

The argument was heard by WALLACE, C. J., BENEDICT, D. J., and ADDISON BROWN, D. J.

WALLACE, C. J. While we have not overlooked the several rulings upon the trial which are impugned by the defendant, our principal attention has been directed to the point most strenuously pressed upon the argument relating to the constitutionality of the act of March 15, 1876, upon which the indictment proceeds. The act prohibits "all executive officers or employes of the United States not appointed by the president, with the advice and consent of the senate," from "requesting, giving to, or receiving from, any other officer or employe of the government any money or property or other thing of value for political purposes." We cannot profess to be ignorant that this law was enacted in order to interdict practices which had become a topic of extended animadversion. But, although it may have been aimed at the suppression of the practice which has prevailed among party organizations of soliciting contributions for party purposes from their office-holding members, or exacting them by a moral coercion; and although its provisions may be well calculated to effect this object,—it does not follow that it can be sustained as a legitimate means to that end. No person can be indicted under it for any other act than the one precisely designated. Whatever may have been the attendant circumstances, and however they may have qualified the moral complexion of the transaction, the person indicted can only be tried for doing the thing which the statute prohibits; and unless this of itself, isolated from all its concomitants, can be competently made a crime by congress, the statute is nugatory.

It is insisted for the defendant that it is not within the constitutional power of congress to make the giving or requesting or receiving of a voluntary contribution for political purposes by a subordinate

government official a criminal offence. It will be observed, however, that the prohibition applies only when there is concerted action between officials in this behalf. The question, then, is whether it is competent for congress to prohibit co-operation between officials in the raising of funds for political purposes. Undoubtedly, it is lawful for congress to prescribe all needful regulations for the discipline of government officials, and to declare what infractions of discipline shall be treated as criminal offences. The power to prohibit acts of officers or employes which are incompatible with the proper discharge of their duties, or which impair the efficiency or tend to demoralize the public service, is essential to promote the end and object of government; and this power resides in the legislative department of the government. In executing this power congress must of necessity exercise its judgment and discretion in determining what acts are or are not of such a pernicious character and tendency. This legislative discretion embraces a large field, and its boundaries cannot always be readily located. It is only when congress has palpably transgressed the limits of its discretion that the judicial department will intervene. Such a case might arise if congress should attempt to prohibit an act of a nature pertaining so exclusively to the sphere of private conduct that it could not, by any implication, impinge upon official deportment or official discipline. We are not able to say that the acts prohibited by the present statute are of such a character. We cannot affirm that congress transcended its discretion in prohibiting transactions between officials which create the relation of donor and donee, and introduce party interests into the public service; nor that congress erred in assuming that the influences springing from this relation and these interests should be discouraged as liable to deflect the independence and impartiality which must rule official intercourse. Many instances may be found in the laws of congress where this legislative discretion has been exercised. It suffices to refer to one contained in the act of February 1, 1870, which prohibits any officer or clerk in the employ of the government from making any gift or present to an official superior. It is not necessary to maintain that the co-operation of officials in raising funds for political objects is essentially demoralizing to the public service, or subversive of discipline. It is sufficient to justify the exercise of the legislative discretion if the prohibited acts tend to introduce interests which disturb the just equipose of official relations. If it is suggested that it is the right and duty of every good citizen to aid in promoting such political objects as he deems to be

wise and beneficial, and that congress has no constitutional power to abridge that right, the answer is that no citizen is required to hold a public office, and if he is unwilling to do so upon such conditions as are prescribed by that department of the government which creates the office, fixes its tenure, and regulates its incidents, it is his duty to resign.

In reaching the conclusion that the statute is not obnoxious to the objections which have been suggested, we have given force to the presumption in favor of its constitutionality which it is the duty of the judiciary to apply to all legislative enactments. This presumption should prevail in all conflicts of interpretation and all doubtful implications of constitutional power, so as, if possible, to sustain the validity of legislative action. We have examined the minor points raised upon the argument and presented in the brief of counsel relating to the rulings upon the trial, but do not deem it necessary to discuss them. We think them to be without merit.

The motion in arrest of judgment and for a new trial is denied.