CONGRESS OF INDUSTRIAL ORGANI-
ZATIONS et al. v. CITY OF
DALLAS et al.

No. 13719.

Court of Civil Appeals of Texas. Dallas.
Oct. 25, 1946.

Rehearing Denied Nov. 29, 1946.

Lindsay P. Walden, of Fort Worth, and George Clifton Edwards, of Dallas, for appellants.

H. P. Kucera, City Atty., and A. J. Thuss, Jr., Asst. City Atty., both of Dallas, for appellees.

144

LOONEY, Justice.

This is an appeal from the refusal of the trial court to grant a temporary injunction sought by the Congress of Industrial Organizations (CIO), a national labor union with headquarters in Washington, D. C., its local affiliate, and Jas. R. Howell, employe of the City of Dallas, member of said local, representing himself and other employes similarly situated, against the City of Dallas and its officials because they threatened to dismiss certain City employes who organized and became members of a local labor union in violation of an ordinance of the City of Dallas adopted in December 1942.

The points of error urged for reversal, in our opinion, may appropriately be summarized as follows:

1. Appellants contend that the City ordinance sought to be annulled is unconstitutional and void, in that it would deprive the individual involved—employes of the City of Dallas, of their right of assembly, freedom of speech, freedom of the press, and the right of petition guaranteed by the First Amendment to the Federal Constitution and protected against invasion by the Fourteenth Amendment thereof; that said ordinance is contrary to the laws and public policy of the United States, giving and guaranteeing the right of workers to form and join labor unions of their own choosing; that said ordinance abridges and deprives appellants of their privileges and immunities, denies to them equal protection of the laws, is arbitrary, unreasonable, and constitutes an improper exercise of the police power by the City of Dallas.

2. That said ordinance is in conflict with and contrary to the laws of the State of Texas, particularly Articles 5152 and 5154A, Vernon's Ann.Civ.St., making it lawful for all employes to organize and become members of labor unions; and, particularly, is in conflict with Article 11, section 5, of the Constitution of the State, Vernon's Ann.St., that prohibits cities from enacting ordinances contrary to the general laws of the State of Texas.

3. Appellants also contend that the ordinance in question is not applicable to them, in that it specifies the type of labor organizations or clubs made unlawful for an officer, agent or employe of the City of Dallas to organize or join; contending, in this connection, that affiliation with the National Labor organization did not in any way place the local union within the category of excluded organizations, within the meaning of said ordinance.

4. And, finally, appellants contend that the court erred in not suspending the order denying to appellants the relief sought and in not permitting them to supersede said order.

These points of error will be considered in the order named; but it should be understood at the beginning that the status of governmental employes, National, State and Municipal, is radically different from that of employes in private business or industry. This distinction has repeatedly been recognized in legislation, such as the National Relations Act by the Congress. Title 29 U.S.C.A. ch. 7, § 152, provides that the Act shall have no application to either Federal, State or Municipal employes; and the Seventy-ninth Congress, Second Session, in the First Supplemental Appropriations Act, 1947, Public Law No. 663, sec. 301, 60 Stat. 910, 918, provides: "Sec. 301. No part of any appropriation contained in this Act shall be used to pay the salary or wages of any person who engages in a strike against the Government of the United States or who is a member of an organization of Government employes that asserts the right to strike against the Government of the United States, or who advocates, or who is a member of an organization that advocates, the overthrow of the Government of the United States by force or violence: * * *."

In this connection we do not deem it inappropriate to quote the late President Roosevelt, as no one can truthfully say he was in any sense inimical to labor. In a letter to the National Federation of Federal Employees, dated August 16, 1937, the late president is quoted as saying: "All government employees should realize that the process of collective bargaining, as usually understood, cannot be transplan-

ted into the public service. It has its distinct and insurmountable limitations when applied to public personnel management. The very nature and purpose of government make it impossible for administrative officials to represent fully or to bind the employer in mutual discussions with government employee organizations. The employer is the whole people, who speak by means of laws enacted by their representatives in Congress. Accordingly, administrative employees and officials alike are governed and guided, and in many instances restricted, by laws which establish policies, procedures, or rules in personnel matters."

The intent and purpose of the ordinance of the City of Dallas under review, in our opinion, is not out of harmony, but is in accord with the legislative expressions above referred to and the ideas expressed by the late president.

A review of case law on the subject reveals that courts, the country over, have uniformly sustained all governmental laws and regulations of the nature, intent and purpose of the ordinance of the City of Dallas now under consideration. The cases are so numerous that to do more than make a mere reference or an occasional excerpt would lengthen this opinion out of bounds. In the case of Railway Mail Ass'n v. Murphy, 180 Misc. 868, 44 N.Y.S. 2d 601, 607, the Supreme Court of New York had under consideration the question of labor unions among public employes. Mr. Justice Murray, speaking for the court, stated, ably and clearly, the reasons why labor unions among public employes were incongruous, illogical and entirely out of place. He said that "To tolerate or recognize any combination of Civil Service employees of the government as a labor organization or union is not only incompatible with the spirit of democracy, but inconsistent with every principle upon which our Government is founded. Nothing is more dangerous to public welfare than to admit that hired servants of the state can dictate to the Government the hours, the wages and conditions under which they will carry on essential services vital to the welfare, safety and security of the citizen.

To admit as true that Government employees have power to halt or check the functions of Government, unless their demands are satisfied, is to transfer to them all legislative, executive and judicial power. Nothing would be more ridiculous. The reasons are obvious which forbid acceptance of any such doctrine. Government is formed for the benefit of all persons, and the duty of all to support it is equally clear. Nothing is more certain than the indispensable necessity of government, and it is equally true, that unless the people surrender some of their natural rights to the Government it cannot operate. Much as we all recognize the value and the necessity of collective bargaining in industrial and social life, nonetheless, such bargaining is impossible between the Government and its employees, by reason of the very nature of Government itself. The formidable and familiar weapon in industrial strike and warfare—the strike—is without justification when used against the Government. When so used, it is rebellion against constituted authority. * * *." The court then concluded, as follows: "To hold otherwise would be to sanction control of governmental functions not by laws but by men. Such policy if followed to its logical conclusion would inevitably lead to chaos, dictators and the annihilation of representative government."

The first Texas case on the subject was McNatt v. Lawther, Tex.Civ.App., 223 S. W. 503. It seems that a labor union, affiliated with the A. F. of L., was organized in the Fire Department of the City of Dallas in 1918. The governing authorities of the City issued an order directing the firemen to disband the union or else suffer the penalty of dismissal. The firemen refused, were dismissed, and McNatt and others filed suit demanding restoration; this demand, being denied by the trial court, was appealed and the judgment below was in all things affirmed. Likewise, in the case of San Antonio Fire Fighters' Local Union No. 84 v. Bell, Tex.Civ.App., 223 S.W. 506, it appears that the ruling authorities of the City of San Antonio issued an order to the firemen who had formed the A. F. of L. affiliation that they

must disband the union or else be dismissed. On behalf of its members, the union brought suit to enjoin the City from carrying out this order. The trial court denied the relief sought; and on appeal its action was affirmed. Also, in the recent case of National Council of Railway Patrolmen's Union v. Sealy, D.C., 1944, 56 F.Supp. 720, Judge Kennerly held that watchmen employed by the City of Galveston to patrol the wharves upon which railroads were located do not come within the Railway Labor Act, 45 U.S.C.A. § 151 et seq.; therefore, the City, which owned the wharves, was not compelled to treat with the labor union with respect to wages of the watchmen. Judge Kennerly brushed aside the usual contentions made in a case of this kind, with the mere statement that the wharves were City property and, therefore, the union had nothing to do with them, nor with the employes of the City of Galveston.

Reported cases reveal many futile attempts by labor unions to organize among governmental employes. In Seattle High School, Chapter No. 200 v. Sharples, 1930, 159 Wash. 424, 293 P. 994, 72 A.L.R. 1215, by the Supreme Court of Washington; in People v. City of Chicago, 278 Ill. 318, 116 N.E. 158, L.R.A. 1917E, 1069, by the Supreme Court of Illinois; and in Frederick v. Owens, 1915, 35 Ohio Cir. Ct. R. 538, the right of school authorities by order or resolution to forbid employment of a member of a labor union as a teacher, was sustained by these courts. In Hutchinson v. Magee, 1923, 278 Pa. 119, 122 A. 234, by the Supreme Court of Pennsylvania; in Carter v. Thompson, 1935, 164 Va. 312, 180 S.E. 410, by the Supreme Court of Virginia; in Fraternal Order of Firemen v. Harris, 306 Mich. 68, 10 N.W.2d 310, by the Supreme Court of Michigan; and in City of Jackson v. McLeod, Miss., 24 So. 2d 319, by the Supreme Court of Mississippi (application for certiorari dismissed by United States Supreme Court, 1946, 66 S. Ct. 1368; the right of City authorities to forbid firemen to maintain membership in a labor union or organization was upheld by these courts. In Perez v. Board of Police Commissioners, City of Los Angeles, the Superior Court of Los Angeles,

April 25, 1946, upheld an order of the Board adopted March 12, 1946, forbidding police officers to become or to continue members of any labor union. In McAuliffe v. Mayor of City of New Bedford, 155 Mass. 216, 29 N.E. 517, by the Supreme Court of Massachusetts; in Brownwell v. Russell, 76 Vt. 326, 57 A. 103, by the Supreme Court of Vermont; in United States v. Curtis, C.C., 12 F. 824, by the Circuit Court of Appeals, in C.I.O. v. Mitchell, D.C., 56 F.Supp. 621 by a three-judge Court, involving the validity of the Hatch Act, 18 U.S.C.A. § 61 et seq., the power of public authorities, State and Federal, to forbid governmental employes to participate in political activities was affirmed by these courts.

■ Appellants' main contention seems to be that the ordinance in question is unconstitutional and void because it would deprive them of certain freedoms, rights and privileges granted by both the Federal and State Constitutions. We do not think so; these rights and privileges are purely personal and may be waived. Appellants overlook the fact that by voluntarily accepting employment with the City of Dallas, they assumed the obligations incident to such employment; impliedly agreed to accept same under the conditions as they existed; agreed to accept the employment and compensation therefor as regulated and controlled by existing laws; especially did they obligate themselves not to organize a labor union or affiliate with one. These employes of the City may assert their constitutional rights and privileges if they choose to do so, but it is quite clear that to assert them under the circumstances would be inconsistent with their duty as employes of the City, and subject them to discharge from the service. While they have the right to these constitutional privileges and freedoms, they have no constitutional right to remain in the service of the City.

In McAuliffe v. Mayor of City of Bedford, supra, the Supreme Court of Massachusetts sustained the action of the City in dismissing plaintiff from its service as a policeman, for the violation of a rule forbidding policemen to participate in

political activities; plaintiff's contention being that his constitutional right to engage in politics, if he saw fit, was violated by the City. The late Oliver Wendell Holmes, Associate Justice of the U. S. Supreme Court, then a member of the Supreme Court of Massachusetts, wrote the opinion; and, responding to plaintiff's contention that his constitutional right was violated, Judge Holmes said, bluntly and concretely: Yes. You have "A constitutional right to talk politics, but you have no constitutional right to be a policeman." The same question was involved in the case of C.I.O. v. Mitchell, D.C., 56 F.Supp. 621, heretofore mentioned. The C.I.O. contended that the "Hatch Act" interfered with the political activities of the labor union. This contention was overruled in a lengthy opinion. In Christal v. Police Commissioners of San Francisco, 33 Cal.App.2d 564, 92 P.2d 416, 418, by the Supreme Court of California, the right of the City to discharge a policeman who, being called before a grand jury to testify in an investigation of alleged official graft and corruption in which he was involved—claimed his constitutional immunity and refused to testify. In disposing of the issues, among other things, the court said: "* * * We are concerned here only with the result of the exercise of such privilege, by those holding the positions of police officers, in an investigation by which it was sought to determine whether such officers had been guilty of criminal activities in connection with their duties as police officers. * * * Privilege permitted them to refuse to answer. They chose to exercise the privilege, but the exercise of such privilege was wholly inconsistent with their duty as police officers. They claim that they had a constitutional right to refuse to answer under the circumstances, but it is certain that they had no constitutional right to remain police officers in the face of their clear violation of the duty imposed upon them. McAuliffe v. Mayor of New Bedford, 155 Mass. 216, 29 N.E. 517." To the same effect, see decisions in Souder v. City of Philadelphia, 305 Pa. 1, 156 A. 245, 77 A.L.R. 610, the Supreme Court of Penn., and Canteline

v. McClelland, 282 N.Y. 166, 25 N.E.2d 972, by the New York Court of Appeals.

Appellants also contend that the ordinance in question is in conflict with and contrary to arts. 5152 and 5154A, Vernon's Ann.Civ.St., insisting that art. 5152, enacted in 1899, made it lawful for all employes to organize and become members of labor unions, and that this idea was strengthened by the Act of 1943 (art. 5154A); hence in view of these statutes the enactment of the ordinance by the City was in conflict with art. 11, sec. 5, of the Constitution that prohibits cities from enacting ordinances in conflict with the general laws of the State. We cannot accept this view of the matter. This same question was urged in McNatt v. Lawther heretofore cited; also in San Antonio Fire Fighters' Local No. 84 v. Bell heretofore referred to. In the McNatt case the court expressly held that the statute had no application to public employes, and in the Bell case the court said [223 S.W. 508]: "It is questionable whether the statute had in view the officers or appointees of a state, county, or municipal government; but, as a decision of that question is not essentially necessary, we do not decide it." Appellants argue that, after the decision of these cases, the Legislature enacted art. 5154A that strengthened their contention that public employes were also included in the statute. On the contrary, we think there are expressions in the Act of 1943 showing conclusively that the Legislature did not have in mind public employes. In Sec. 1, the Preamble, this language is found: "Because of the activities of labor unions affecting the economic conditions of the country and the State, entering as they do into practically *every business and industrial enterprise,* it is the sense of the Legislature that such organizations affect the public interest and are charged with a public use." (Italics ours.) And in Sec. 2, near its conclusion, this language is found: "(e) 'Working agreement' means a collective bargaining contract with an employer for union labor employees in *any business or industry,* and shall include any renewal, extension, etc." (Italics ours.) These phrases, in our opinion, in-

dicate that the Legislature was dealing simply with the employes in business and industrial enterprises. In the recent case of Miami Water Works Local No. 654 v. City of Miami, 1946, 26 So.2d 194, by the Supreme Court of Florida, the court held that a similar statute invoked in that case applied to private industry and private employes and not to public employes.

■ Appellants also contend that by affiliating with the CIO national organization the local union did not place itself within the category of excluded labor organizations within the meaning of the City ordinance.

Bearing upon this contention, the record discloses that this suit was filed March 22, 1946 by the national body, at which time the local union had not been formally organized. Thereafter, March 31, 1946, the local union was organized by about 200 employes of the City; immediately affiliated with the national body, and, in an amended petition filed April 1, 1946, joined in the suit as plaintiff; also, Jas. H. Howell, member of the local union, representing himself and other employes similarly situated, joined in the suit as plaintiff.

After organizing, the local body adopted a Constitution and By-Laws which, among other things, provides that "This organization, its charter or any by-laws or rules promulgated thereunder by this organization shall not govern or control its members in the matter of working time, working conditions or compensation to be asked or demanded of the City of Dallas; and the use of the strike or other concerted economic weapons or procedures to effect the purposes of this organization are expressly prohibited." Based upon the facts just recited, appellants contend that "It is quite clear that affiliation with the national organization does not in any manner place the local union within the category of excluded labor organizations within the meaning of the ordinance."

There are several sound reasons, in our opinion, why the proposition just asserted cannot be successfully maintained. In the first place, appellants misconstrue the meaning of the ordinance (copied in full at page 2, appellee's brief). The gravamen of the offense defined by the ordinance is "for any officer, agent or employe, or any group of them, of the City of Dallas to organize a labor union, organization, or club of City employes, or to be or become a member thereof"—and this without regard to whether such local union is affiliated with any other local, State, national or international body or organization, etc. The fact that the City employes organized and became members of the local union, violated the ordinance and subjected them to the penalty of being discharged from the service of the City; and this result would follow, whether the local affiliated with the national organization or not.

Seemingly, the purported Constitution and By-Laws adopted by the local was to meet an exigency of this lawsuit, and by disclaiming any purpose to employ collective bargaining in regard to working time, working conditions, or compensation to be demanded of the City, or to use the strike or other concerted economic weapons or procedure to effectuate its purpose, obviously the local sought to win recognition for itself as a labor organization. Upon its face, the document, the Constitution and By-Laws, shows it was designed for temporary use, is tentative in nature, in fact, meaningless, in that by an express provision may be amended or repealed at any meeting by a majority vote of the members present (See Constitution and By-Laws, pp. 36-38 tr.).

Besides, such declaration of the local to abandon the usual procedure pursued by labor unions to accomplish their purposes, is in irreconcilable conflict with the declared purposes and objects of the unions as alleged in appellants' petition. In paragraph 2 of their amended petition (p. 24 tr.) it is alleged that the local union "is affiliated with the said national organizations, and as such organization it has admitted to membership therein in excess of two hundred (200) working employees of the defendant City of Dallas, each of whom have (has) voluntarily authorized plaintiff to represent them in all matters pertaining to rates of pay, wages, hours of work and other conditions of employment with said defendant employer, and each of whom have (has) requested and accepted member-

ship in plaintiff organization. That both plaintiff labor organizations are authorized to act for and in behalf of each other, subject to their respective constitutions and by-laws." And in paragraph 3 (p. 25 tr.), it is alleged that the national organization was organized in 1935 for the purpose of organizing into voluntary unincorporated associations for the purpose of forming, joining and assisting their organizations so formed "to bargain collectively through representatives of their own choosing and otherwise dealing with their employers concerning hours of employment, rates of pay, working conditions or grievances of any kind relating to employment, all for their mutual aid and protection, and for the purpose, by these and other means, of protecting themselves and improving their working conditions, wages and employment relationships." Another purpose mentioned in paragraph 4 of the petition (p. 26 tr.) is "To provide sufficient skilled, competent and experienced workers for employers at a predetermined applicable wage rate." Also alleged in paragraph 8 of the petition (p. 27, 28 tr.) that the activities referred to above "constitute the only effective means possessed by organized labor to accomplish economic security and otherwise deter the practices of employers which are destructive of public policy and of the interest of wage earners generally and of members of labor organizations and of plaintiff labor organization herein, and said activities are indispensable concomitants of the right of employees to organize into labor organizations and to bargain collectively with employers and otherwise to advance their mutual interests and welfare."

Besides, the attempt to change the purpose of the union would be subversive and prohibited by the constitution and laws of the national organization. The local union is now an affiliate of the national CIO and subject to its domination and control; the declared objects of the national CIO are to bring about an effective organization of working men and women, to unite them for common action into labor unions to extend the benefits of collective bargaining to secure for workers means to establish peaceful relations with employers by form-ing labor unions capable of dealing with modern aggregates of industry and finance. (Subdivisions 1 and 2, Article II, CIO constitution). Certificates of affiliation are issued to local unions by the executive board of the national body, and it is provided that "The Executive Board shall issue rules governing conduct, activities, affairs, and the suspension and expulsion of local industrial unions." (Constitution of CIO, art. III, sec. 3, pp. 6, 7.). The handbook for CIO local industrial union contains rules and a model constitution and by-laws for locals; states that the constitution of the CIO is the supreme law governing all affiliates; that the CIO rules for locals are compulsory and may not be changed in any way by any local. And with reference to the model constitution and by-laws suggested, the handbook states that while same is not compulsory, that a local may make changes "provided such changes do not conflict with the CIO constitution and rules." (pp. 5, 6 Handbook). (Printed copies of the constitution of the national organization and the Handbook above mentioned constitute a part of the statement of facts, and are attached to the same.)

The point of error complaining that the court erred in not suspending the order appealed from and in not permitting appellants to supersede the order, is overruled. The court did not err in refusing to suspend the order refusing the temporary injunction. The primary order issued had served its purpose; hence in refusing to grant the temporary writ there was nothing to either suspend or supersede. See Rule 385(d) and Connor v. Connor, Tex.Civ.App., 113 S.W.2d 298.

After carefully considering all points of error urged by appellants for reversal, and failing to find reversible error, the judgment of the trial court in all things is affirmed.

### On rehearing.

BOND, Chief Justice, enters oral memorandum opinion, expressing accord in the conclusion of the majority and the judgment entered; but not in the approval of the authorities from other jurisdictions, evidencing judicial prejudice against the Unions generally.