[Civ. No. 16794. Second Dist., Div. Three. Oct. 6, 1949.]

THE CITY OF LOS ANGELES et al., Respondents, v. LOS ANGELES BUILDING AND CONSTRUCTION TRADES COUNCIL (an Unincorporated Association) et al., Appellants.

Arthur Garrett and Clarence Todd for Appellants.

Ray L. Chesebro, City Attorney, Gilmore Tillman, Chief Assistant City Attorney, Cornelius T. Waldo, Assistant City Attorney, A. L. Lawson and Alfred H. Driscoll, Deputy City Attorneys, for Respondents.

SHINN, P. J.—The question for determination on this appeal involves the right of organized labor to strike, picket, and engage in other concerted labor activities against a governmental, rather than a private, employer.

The action was brought by the city of Los Angeles and its department of water and power, which was engaged in construction and modification work upon some eight major water and electrical projects in the city, to enjoin a group of labor unions from striking, picketing, declaring the department unfair, and engaging in other concerted action for the purpose of coercing the department to comply with certain demands of defendants regarding working conditions on said projects. A preliminary injunction was granted on March 11, 1948, after a hearing of an order to show cause issued on plaintiffs' verified complaint. The appeal is from the injunction, and challenges its validity solely upon constitutional grounds.

By the terms of the preliminary injunction, the defendant unions, and "all persons in active concert or participation with them," were restrained during the pendency of the action or until the further order of the court from "Striking, or calling or inducing a strike against the Department of Water and Power of The City of Los Angeles at any of its projects hereinafter enumerated, or picketing any of said projects, or giving any notice stating or implying that a strike exists at any of said projects or threatening to strike or picket any of said projects or hindering, delaying or interfering with, in any manner or by any means or device, the work upon any of said projects, for the purpose of intimidating or coercing The City of Los Angeles, the Department of Water and Power, the Board of Water and Power Commissioners, the Board of Civil Service Commissioners, or any officer of said City in the performance of their or his lawful duties; and coercing, compelling, inducing or encouraging the employees of said Department of Water and Power, who are employed on said projects, to hinder, delay or interfere with the work on said projects, by strike, walk-out, cessation of work, or otherwise." After describing the projects affected,

the injunction concluded with the statement that "Nothing in this order shall be construed as affecting the right of any employee of said Department to abandon or to resign his employment."

The evidence upon which the injunction was granted was contained in plaintiffs' verified complaint, and in three affidavits filed by defendants.

The following facts were before the court: The Department of Water and Power of The City of Los Angeles is a duly constituted department of the city government. It is required and empowered by the city charter to construct and operate facilities to supply water and electricity to the city and its inhabitants. Approximately $450,000,000 is presently invested in publicly owned water and electric systems under its management and control. In December, 1947, in order to meet the greatly increasing demands being made upon it by reason of the rapid growth of the city, the department was engaged in an extensive construction program to enlarge and improve its facilities. The estimated cost of the eight separate construction projects here involved exceeds $48,000,000. Of these projects, all but two were being built entirely by direct employment and purchase of materials by the department; the two largest projects were being constructed in part by independent contractors. Some 420 persons were directly employed by the department on the several projects, all of whom were classified members of the civil service. Ninety or more of these employees, and nearly all of the employees of the independent contractors, were members of one or more of defendant unions.

Beginning in December, 1947, defendant unions made repeated demands upon the department relating to working conditions. According to the allegations of the complaint, the foremost demand was "that said department require all of said persons so employed directly by it to be or become members of some one of the defendants labor unions, or that the department remove said persons from said projects and employ thereon only members of such a labor union." Other demands alleged were as follows: That the board of water and power commissioners and board of civil service commissioners fix and classify the duties of civil service positions in the department in conformity with the craft jurisdictions and job classifications recognized by defendants; that the department provide craft foremen to supervise the work "in conformity with the provisions of the collective bargaining agreements

which said defendants have made with private employers'';
and that the board of water and power commissioners fix wages
and salaries in accordance with ''standards and rules estab-
lished, approved and recognized by said defendants.'' De-
fendants' version of the union demands, as shown by affi-
davit was that the unions proposed that the department follow
a ''union policy'' on the new construction, by transferring
sufficient union employees from repair and maintenance work
to the new construction so as to completely man those jobs,
and with respect to new employees put only union members
on new construction work. Defendants admitted, by affidavit,
the other demands allegedly made, and averred in justification
therefor that the prevailing system of classification and defi-
nition of the duties of department employees was being used
as a device to avoid payment of wages equivalent to those
being paid for comparable services rendered to private em-
ployers, in violation of section 425 of the city charter. After
a series of conferences between union and departmental offi-
cials, as a result of which the department allegedly made some
changes in its overtime pay policies but otherwise rejected
the union demands, a strike was called on February 6, 1948.
The department's projects were declared to be ''unfair,''
pickets were posted, and all of the union employees withdrew
from work. It is not contended that the picketing was not
entirely peaceful, nor that the representations made were
either false or fraudulent.

The case presents the important question whether organized
labor may legitimately strike and picket government itself.
The city tacitly concedes that the complaint would not state
a cause of action as against an ordinary employer in private
industry (*McKay* v. *Retail Auto S. L. Union No. 1067,* 16 Cal.
2d 311 [106 P.2d 373]; *Shafer* v. *Registered Pharmacists
Union,* 16 Cal.2d 379 [106 P.2d 403]); and we are not called
upon to determine whether it would be sufficient as against a
privately owned public utility or common carrier (see *North-
western Pac. R. R. Co.* v. *Lumber & S. W. Union,* 31 Cal.2d
441, 446-448 [189 P.2d 277]).

Although no case has been found, nor has any been
cited to us, which affirms that there exists a constitutional
right to strike, as distinct from other constitutional rights,
we are faced with a clear constitutional issue in respect to the
portions of the injunction which restrain picketing and other
forms of communication relating to the controversy between
the parties. In *Thornhill* v. *Alabama,* 310 U.S. 88 [60 S.Ct.

736, 84 L.Ed. 1093], and *Carlson* v. *State of California,* 310 U.S. 106 [60 S.Ct. 746, 84 L.Ed. 1104], the principle was laid down that peaceful picketing for the purpose of publicizing the truthful facts of an industrial labor dispute was an exercise of freedom of discussion which under the Fourteenth Amendment to the United States Constitution, could not be generally prohibited by state action. The right, of course, is not free from limitation. It does not extend beyond the bounds of legality. And as said by Mr. Justice Brandeis in *Dorchy* v. *Kansas* (1926), 272 U.S. 306, 311 [47 S.Ct. 86, 71 L.Ed. 248], ''a strike may be illegal because of its purpose, however orderly the manner in which it is conducted. . . . Neither the common law, nor the 14th Amendment, confers the absolute right to strike.'' In *International Union* v. *Wisconsin Emp. Rel. Bd.* (Feb. 28, 1949), 336 U.S. 245 [69 S.Ct. 516, 93 L.Ed. ——, ——], citing and quoting with approval from *Dorchy* v. *Kansas,* the court said: ''The right to strike, because of its more serious impact upon the public interest, is more vulnerable to regulation than the right to organize and select representatives for lawful purposes of collective bargaining, which this Court has characterized as a 'fundamental right' . . . .'' In upholding the power of a state to outlaw intermittent, unannounced work stoppages, the court there reaffirmed the principle that to whatever extent there is a right to strike, that right plainly contemplates a lawful strike. One which runs afoul of statute law or public policy is not entitled to legal protection, and may be subject to legal restrictions. (See *National Labor Relations Bd.* v. *Fensteel Metallurgical Corp.,* 306 U.S. 240 [59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599], sit-down strikes; *Southern S. S. Co.* v. *National Labor Relations Bd.,* 316 U.S. 31 [62 S.Ct. 886, 86 L.Ed. 1246], mutiny; *United States* v. *United Mine Workers,* 330 U.S. 258 [67 S.Ct. 677, 91 L.Ed. 884], strike creating national emergency; *Lafayette Dramatic Productions* v. *Ferentz,* 305 Mich. 193 [9 N.W.2d 57, 145 A.L.R. 1158], strike to compel hiring of unwanted employees. See, also, 31 Am.Jur. §§ 204-221, pp. 934-942; anno., 71 L.Ed. 250-268, citing many cases.) In the Thornhill case it was expressly recognized, and subsequent decisions involving a variety of circumstances have affirmed, that limitations may be imposed upon picketing or other concerted action where the objective sought is not a permissible one under the applicable state law, or as viewed from the standpoint of public policy. (*Hughes* v. *Superior Court,* 32 Cal.2d 850 [198 P.2d

885], cert. granted, 336 U.S. 966 [69 S.Ct. 930, 93 L.Ed. ——], discriminatory hiring of fixed proportion of Negro employees; *Northwestern Pac. R. R. Co.* v. *Lumber & S. W. Union,* 31 Cal.2d 441 [189 P.2d 277], interference with common carrier's performance of statutory duty; *Park & Tilford I. Corp.* v. *International etc. of Teamsters,* 27 Cal.2d 599 [165 P.2d 891, 162 A.L.R. 1426], closed shop contract in violation of National Labor Relations Act [49 Stats. 449, 29 U.S.C.A. § 151 et seq.] ; *James* v. *Marinship Corp.,* 25 Cal.2d 721 [155 P. 2d 329, 160 A.L.R. 900], closed shop contract with union with discriminatory membership policy; *Riviello* v. *Journeymen Barbers etc. Union,* 88 Cal.App.2d 499 [199 P.2d 400], semble; *Bautista* v. *Jones,* 25 Cal.2d 746 [155 P.2d 343], elimination of independent businessmen-workers in competition with "closed union"; *Giboney* v. *Empire Storage & Ice Co.,* 336 U.S. 490 [69 S.Ct. 684, 93 L.Ed. ——], violation of state antitrust law; *Fashioncraft, Inc.* v. *Halpern,* 313 Mass. 385 [48 N.E.2d 1], closed shop in violation of state public policy; *Schwab* v. *Moving Picture Mach. Operators Local,* 165 Ore. 602 [109 P.2d 600], closed shop contract with "closed union"; *Markham & Callow, Inc.* v. *International Woodworkers,* 170 Ore. 517 [135 P.2d 727], to induce employer to violate union shop contract with certified bargaining agent.) While it was said in the Thornhill case, that "[a]bridgement of the liberty of such discussion can be justified only where the clear danger of substantive evils arises under circumstances affording no opportunity to test the merits of ideas by competition for acceptance in the market of public opinion." (310 U.S. at pp. 104-105), our Supreme Court has observed that the protection afforded by the free speech guarantee to disputants in labor controversies is not "necessarily controlled by the clear and present danger test" to the same extent as in ordinary free speech cases. (*In re Blaney,* 30 Cal.2d 643, 648 [184 P.2d 892].) Many of the cases upon which defendants rely fall in the latter category. Broad language employed therein, with reference to entirely different circumstances, cannot be deemed decisive of the present controversy, especially where, on its face, at least, such language may not appear to be entirely consistent with essential principles of law that have been developed to meet problems peculiar to the field of labor relations. As the cases cited above illustrate, illegality of purpose provides a complete basis for injunctive relief against conduct which would otherwise be deemed a permissible exercise of fundamental rights. Where such illegality consists of violation

of settled public policy, as well as in other cases of illegal conduct, the injured party has a right to be protected from the imminent harmful consequence of such action.

The issues for decision involve public employment. At the outset we may put to one side the authorities dealing with the legality of labor objectives in disputes with private industry, as not being appropriate to our inquiry; for, as was pointedly said in *Perez* v. *Board of Police Commrs.*, 78 Cal. App.2d 638, 647 [178 P.2d 537], "[n]othing can be gained by comparing public employment with private employment; there can be no analogy in such a comparison." Accordingly, our inquiry will be directed to the peculiar nature of public employment, and particularly to the legal foundations of such employment in the Los Angeles Department of Water and Power.

The charter of the city of Los Angeles created the department of water and power as a department of the "city government," with the power and duty, among other things, "to construct, operate, maintain, extend, manage and control works and property for the purpose of supplying the city and its inhabitants with water and electric energy. . . ." (Charter, §§ 70, 221; Stats. 1925, pp. 1056, 1095.) Control and management of the department is vested in a board of water and power commissioners, whose members are officers of the city. (Charter, §§ 71, 78, 5; Stats. 1925, pp. 1056, 1058, 1039.) The board is charged with the duty to "create the necessary positions in said department, authorize the necessary deputies, assistants and employees and fix their salaries and duties, and fix the salary of the general manager of the department and may require bonds of any or all such employees for the faithful performance of their duties." (Charter, § 86; Stats. 1925, p. 1060.) In fixing the compensation of city employees, it is provided that the appropriate authority "shall, in each instance, provide a salary or wage at least equal to the prevailing salary or wage, for the same quality of service rendered to private persons, firms or corporations under similar employment, in case such prevailing salary or wage can be ascertained." (Charter, § 425, as amended; Stats. 1935, p. 2339.)

The charter further provides for a complete scheme of civil service, under the control and direction of a board of civil service commissioners, which, among other things, is charged with the duty of classifying all nonexempted positions in the city employ (including all but the highest executive positions

in the department of water and power). The charter requires that ''Each class shall include all positions sufficiently similar in respect to the duties and responsibilities therefor in which: (a) The same requirements as to education, experience, knowledge and ability are demanded of incumbents; (b) the same tests of fitness may be used in choosing qualified appointees; (c) the same schedule of compensation may be made to apply with equity. The offices and places so classified by the Board shall constitute the classified civil service of said city; and no appointment to any such offices and places shall be made except under and according to the rules hereinafter mentioned.'' (Charter, §§ 100, 103; Stats. 1925, p. 1062.) Selection, appointment, and promotion of employees in the classified service is upon the basis of competitive examinations. The charter also provides that ''unskilled laborers, including drivers,'' and ''persons employed on the construction of public works, improvements or buildings,'' may be exempted from the civil service requirements ''upon the request of the head of the department in which they are employed, by order of the Board of Civil Service Commissioners, approved by the [City] Council by resolution''; but ''[a]ny exemption thus made may be terminated at any time by resolution of the Board of Civil Service Commissioners.'' (Charter, § 111; Stats. 1925, p. 1066.)

■ The employer-employee relationship in the city's service is governed by statutory law and administrative regulation; it is not fixed, either in whole or in part, by contract, as in the field of private industry. The positions which are ''necessary'' in the department of water and power must be determined by the managing board and there is no requirement that the number or nature of the positions or the required duties or skills conform to those generally established in comparable private enterprise. The board of civil service commissioners is not only free, but is under a duty to prescribe positions and classes which, in its view, most nearly accord with the letter and spirit of the civil service law. To be sure, the salaries or wages of city employees must be set at the prevailing rate, but only ''in case such prevailing salary or wage can be ascertained.'' To the extent that the job classifications differ, so too will the wage and salary schedules differ, as between public and private employees; and any lack of uniformity of wage policies as between private employers in comparable enterprises will normally be reflected in the determination of what is the prevailing wage for civil

service purposes. ██ The provisions for open and competitive examinations as the basis of employment in the classified service rule out any discriminations in hiring policies in favor of labor union members, and, perforce, forbid a closed or union shop.

██ Manifestly, the operations of the department of water and power are controlled by the same public law from which its authority to act is derived. In *Nutter* v. *City of Santa Monica*, 74 Cal.App.2d 292 [168 P.2d 741], this court gave full consideration to the distinguishing features of public employment in holding that a city government was not under any legal duty to bargain collectively with a union of municipal transit employees. The legislative policy favoring collective bargaining as to the terms and conditions of labor, incorporated in section 923 of the Labor Code, was there held to be inapplicable to cases like the present one: ''Those who enter public employment do not thereby acquire the right to arrange, by negotiation and contract, terms and conditions of employment which are defined by law or, under established systems, are subject to regulation by governmental bodies.'' (74 Cal.App.2d at p. 298.) In the Nutter case, it was not necessary to determine to what extent, nor in reference to what matters, collective bargaining would be permissible if voluntarily engaged in by the city, nor is it necessary to do so here. Not only are all of the asserted demands of defendants clearly within the scope of express charter regulation, but the complaint alleges that plaintiffs have offered at all times to ''discuss'' with defendants any of the demands except that for a closed or union shop on its construction projects.

██ Defendants make the contention that when acting in a proprietary capacity, as the Los Angeles Department of Water and Power is asserted to be acting, the city is subject to the same obligations and liabilities as a private employer, and accordingly the availability to it of injunctive relief against strikes and picketing is the same as that of a private employer. We need not decide whether, in view of the fact that water and electricity are used by both public and private consumers, the department is acting solely in a proprietary capacity (compare *City of Huntingburg* [*Huntington*] v. *Morgen*, 90 Ind.App. 573 [162 N.E. 255, 257], and *Eastern Illinois State Normal School* v. *City of Charleston*, 271 Ill. 602 [111 N.E. 573, 575], with *Christian* v. *City of New London*, 234 Wis. 123 [290 N.W. 621, 623]; see, also, *Brush* v.

*Commissioner of Int. Revenue,* 300 U.S. 352, 370-371 [57 S.Ct. 495, 81 L.Ed. 691, 108 A.L.R. 1428]), for we are of the opinion that no legitimate reason can be found for drawing any distinction, within the framework of the present case, between the governmental and proprietary functions of the city. The distinction was developed by the courts for application chiefly in cases involving the tort liability of municipal corporations, ''to escape difficulties, in order that injustice may not result from the recognition of technical defenses based upon the governmental character of such corporations.'' (*Trenton* v. *New Jersey,* 262 U.S. 182, 192 [43 S.Ct. 534, 67 L.Ed. 937].) It has no rational application in the present situation. The city, having been lawfully empowered by its charter to furnish water and electricity to its inhabitants, is thereby performing a municipal and public function, irrespective of whether it is acting in a ''proprietary'' or ''governmental'' capacity. (*Irish* v. *Hahn,* 208 Cal. 339, 344 [281 P. 385, 66 A.L.R. 1382].) A single civil service system governs all classified positions in the city's service, regardless of whether they involve an exercise of governmental or proprietary functions. Manifestly, all of the city's classified employees, regardless of function performed, must be considered upon the same basis. The legal principles governing the city's obligations respecting the working conditions of water and power employees can be no different from those pertaining to any other employees. A contention similar to that made here was squarely rejected by this court in *Nutter* v. *City of Santa Monica,* 74 Cal.App.2d 292, 302 [168 P.2d 741], in treating of the duty of a municipality to bargain collectively with a union of city bus line employees. (Accord: *City of Springfield* v. *Clouse,* 356 Mo. 1239 [206 S.W.2d 539, 546].)

From what has already been said, we think it is self-evident that defendants may not, consistently with the public policy expressed in the Los Angeles City Charter, lawfully either strike or picket for the purpose of enforcing demands as to conditions of employment in respect to which neither the city nor the department of water and power is obligated to bargain collectively. To hold to the contrary would be to sanction government by contract instead of government by law. The charter mandate for nondiscriminatory competitive civil service examinations clearly cannot be modified by agreement, whether coerced by economic and moral suasion, or free and voluntary. Likewise, to the extent that the conditions

of employment commonly arranged by contract are covered by the provisions of the city charter, those provisions are controlling and neither the board of water and power commissioners nor any other city officers, may deviate therefrom by contract. ▮ Furthermore, to the extent that the city authorities are vested by the charter with continuing discretionary powers such as the power to establish, classify (or exempt from the requirements of the classified service), and fix salaries for the various positions in the public employ, and direct the conduct of the work, such discretion may not be lawfully abdicated or delegated. (See *Mugford* v. *Mayor & City Council of Baltimore*, 185 Md. 266 [44 A.2d 745, 747, 142 A.L.R. 1101]; *Hagerman* v. *City of Dayton*, 147 Ohio St. 313 [71 N.E.2d 246, 254].) Strikes and picketing to accomplish these objectives are unquestionably for an unlawful purpose.

We may add that although the exact question of the validity of strikes and picketing against a governmental employer does not appear to have been squarely decided in any reported decision of a court of last resort, the cases uniformly recognize the validity of the principles of law which we have stated. (See *Miami Water Works Local No. 654* v. *City of Miami*, 157 Fla. 445 [26 So.2d 194, 165 A.L.R. 967] and *Congress of Industrial Organizations* v. *City of Dallas* (Tex.Civ.App.), 198 S.W.2d 143, both of which are cited and quoted with approval in *Perez* v. *Board of Police Commrs.*, 78 Cal.App. 2d 638 [178 P.2d 537]; *Petrucci* v. *Hogan*, 27 N.Y.S.2d 718; *Mugford* v. *Mayor & City Council of Baltimore, supra*; *City of Springfield* v. *Clouse, supra*; *Hagerman* v. *City of Dayton, supra*.) In the Miami case, wherein the court on similar facts reached the same conclusion which this court did in *Nutter* v. *City of Santa Monica, supra*, it is said that the familiar terms of industrial conflict, such as "collective bargaining," "strike," and "picketing," "are strange and incongruous terms when attempted to be squared with the governmental process as we know it, or when projected into the field of municipal legislation. . . . While strikes are recognized by the statute to be lawful under some circumstances, it would seem that a strike against the city would amount, in effect, to a strike against government itself—a situation difficult to reconcile with all notions of government." (26 So.2d at p. 197.) The opinion in the Dallas case expresses the same view, adopting the following language from *Railway Mail Assn.* v. *Murphy*, 180 Misc. 868 [44 N.Y.S.2d 601]:

" 'The formidable and familiar weapon in industrial strife and warfare—the strike—is without justification when used against the Government. When so used, it is rebellion against constituted authority. . . . To hold otherwise would be to sanction control of governmental functions not by law but by men.' " (198 S.W.2d at p. 145.) In *Petrucci* v. *Hogan,* the court enjoined picketing of municipal employees' homes to compel payment of union dues, saying, "The City is not at liberty to act in derogation of the provisions of the Constitution or the Civil Service law, and picketing that has for its ultimate object establishment of a 'closed shop' wherein only those shall be employed who are members of the union cannot be viewed as legal." (27 N.Y.S. 2d at p. 726.) ■ All the cited cases either expressly or implicitly acknowledge that to the extent that the terms and conditions of public employment are governed by statute or charter, they are not subject to modification by contract, and concerted labor activity instigated for the purpose of affecting such terms and conditions is not sanctioned by the law. (See, also, Teller, Labor Disputes and Collective Bargaining, vol. 5, 1947 Cum.Supp., § 171, pp. 113-119, and authorities there cited; Rhyne, Labor Unions and Municipal Employe Law (1946), pp. 44-51, 138-139, 436, 437, and authorities there cited; note, 54 Harv. L.Rev. 1360, 1364-1366.) It follows from the authorities previously discussed that since defendants' objections are contrary to the law and to prevailing public policy, injunctive relief against both striking and picketing to accomplish those objectives is not violative of any constitutional limitations.

■ Our conclusion in this respect finds support also in numerous cases sustaining the validity of regulations prescribing, as a condition of public employment, certain restrictions upon rights which such employees would otherwise be free to enjoy as private citizens. (See *Perez* v. *Board of Police Commrs., supra; King* v. *Priest,* 357 Mo. 68 [206 S.W.2d 547]; *City of Jackson* v. *McLeod,* 199 Miss. 676 [24 So.2d 319], *Fraternal Order of Police* v. *Harris,* 306 Mich. 68 [10 N.W.2d 310]; *Hutchinson* v. *Magee,* 278 Pa. 119 [122 A. 234]; *Carter* v. *Thompson,* 164 Va. 312 [180 S.E. 410]; *Seattle High School Chap. No. 200* v. *Sharples,* 159 Wash. 424 [293 P. 994, 72 A.L.R. 1215]; *People* v. *City of Chicago,* 278 Ill. 318 [116 N.E. 158, L.R.A. 1917E 1069]), and *Congress of Industrial Organizations* v. *City of Dallas, supra,* sustaining the right of public authorities to forbid union membership by policemen, firemen, school teachers, and civil service em-

ployees in general. See, also, *McAuliffe* v. *Mayor etc. of City of New Bedford*, 155 Mass. 216 [29 N.E. 517]; *Brownell* v. *Russell*, 76 Vt. 326 [57 A. 103]; *State* v. *Kirby*, 349 Mo. 988 [163 S.W.2d 990], and *United Public Workers* v. *Mitchell*, 330 U.S. 75 [67 S.Ct. 556, 91 L.Ed. 754], upholding, as against attack on constitutional grounds as interference with freedom of speech, freedom of suffrage or personal liberty, restrictions upon the political activities of certain public employees.) The controlling principle of the foregoing cases is that employment in the public service frequently entails a necessary surrender of certain civil rights to a limited extent (*cf.*, *Christal* v. *Police Commission*, 33 Cal.App.2d 564, 569 [92 P.2d 416]), because of the dominant public interest in the unimpeded and uninterrupted performance of the functions of government. Fair treatment for public employees does not require legal protection for concerted labor action generally, as in the case of private employment, for such treatment is, in the public field, compelled to a considerable extent by law. Although the holdings in the above cited cases must be confined to their particular facts the legal principles underlying those decisions are fully and properly applicable with respect to the present case. We may with propriety refer to the observation of Mr. Justice Reed, in *United Public Workers* v. *Mitchell, supra,* that the fundamental human rights preserved as against governmental emasculation by the First, and thus also by the Fourteenth, Amendments, "in some instances are subject to the elemental need for order without which the guarantees of civil rights to others would be a mockery." (330 U.S. at p. 95.)

Defendants refer to the legislative history of Senate Bill 949 (1947 Legislature), which would have declared a strike of public employees to be contrary to public policy, and a misdemeanor. It was passed in the Senate, but no action upon it was taken by the Assembly. Under these circumstances, the failure of the Legislature to enact this proposed legislation cannot be considered as even remotely supporting defendants' position. Its passage in the Senate would, if anything, tend to support the views we have expressed; whereas mere nonaction in the Assembly conveys no implication either way. The point is obviously untenable.

We find no merit in defendants' further claim that the injunctive relief granted is too broad. Reasonably construed, the plain meaning of the language employed merely

restrains the defendant unions from conduct we have held to be unlawful, namely, striking, picketing, and like activities where the purpose is to intimidate or coerce the city authorities in the performance of their lawful duties and inducing the employees of the department of water and power to strike or otherwise interfere with the work on the department's specified projects. No restraints are imposed upon the exercise, by defendants, of any other means at their disposal to publicize their grievances in an attempt to either change the law governing the conditions of employment, or convince the appropriate officers with discretionary powers of the merits of their contentions so that they might exercise their discretion favorably to defendants within the prescribed limits of their authority. In the absence of any evidence whatsoever in the record as to the existence of a labor dispute between any of the independent contractors and its employees, we cannot assume that the injunction was intended, or would be construed to ban strikes or peaceful picketing by such private employees to enforce legitimate demands against their employers. On its face, the order only forbids action against the city. Only insofar as the employees of the contractors might engage in the specified activities in order to coerce or intimidate the officers of the city, or to induce the employees of the city to strike or cease work, would their conduct be unlawful. As has been often stated, it is "impossible to define comprehensively or with exactness each and every act which may or may not be legally done in carrying on a labor controversy; and it is evident that any attempt to do so would lead into a field of unlimited speculation." (*Lisse* v. *Local Union No. 31,* 2 Cal.2d 312, 323 [41 P.2d 314].) The present injunction adequately deals with the unlawful aspects of defendants' conduct as shown by the facts in evidence. We see no occasion to modify it.

The order of injunction is affirmed.

Wood, J., and Vallée, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied December 5, 1949. Carter, J., and Traynor, J., voted for a hearing.