78 So.2d 646

**GOVERNMENT & CIVIC EMPLOYEES OR-GANIZING COMMITTEE, CIO,**

v.

**S. F. WINDSOR et al.**

**S. F. WINDSOR et al.**

v.

**GOVERNMENT & CIVIC EMPLOYEES OR-GANIZING COMMITTEE, CIO.**

3 Div. 702, 702A.

Supreme Court of Alabama.

March 10, 1955.

Cooper, Mitch & Black, Birmingham, Arthur J. Goldberg, David E. Feller, and Thos. E. Harris, Washington, D. C., for appellant.

Bernard F. Sykes, Gordon Madison, Asst. Attys. Gen., and Jesse M. Williams, Montgomery, for appellees.

LAWSON, Justice.

This is an appeal from a decree of the circuit court of Montgomery County, in equity, rendered in a declaratory judgment proceeding.

The complainant below was the Government & Civic Employees Organizing Committee, CIO, an unincorporated association, to which we will refer as the Committee. We will sometimes refer hereafter to the Congress of Industrial Organizations as the Organization.

The Committee is the appellant here and contends that the trial court erred in declaring that it is a labor union or labor organization as defined in Act 720, H. 231, approved September 17, 1953, Acts of Alabama 1953, p. 974 (which the reporter will set out and to which we will sometimes refer hereafter as the Solomon Bill), and in declaring that the provisions of the Solomon Bill have application to complainant and its members, including employees of the State of Alabama connected with the Alabama Alcoholic Beverage Control Board (sometimes referred to hereafter as the Board).

We are of the opinion that the bill shows a justiciable controversy between complainant and the respondents, Curry v. Woodstock Slag Corporation, 242 Ala. 379, 6 So.2d 479, and that the trial court properly proceeded to the rendition of the final decree with the declarations of which we are in accord. The respondents were officers and agents of the Board from the time the bill was filed until submission here.

The evidence shows that the Organization is composed of affiliated national and international unions, *organizing committees,* local industrial unions and industrial union councils. According to its constitution it is unquestionably a labor organization "in which employees participate for the purpose [among other purposes] of dealing with one or more employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." § 1 of Solomon Bill.

It is our understanding of the record before us that when the Organization determines that it is advisable to create an international union of CIO, to be composed of employees in a given industry or field of labor, that decision is effectuated in the following manner: Its president, acting under authority of the executive board, appoints a national organizing committee, charged with the duty and responsibility of organizing the employees into local unions which will later be formed into the international union.

The Committee of instant concern was established as an affiliate of the Organization on March 1, 1950, by the late Phillip Murray, the then president of the Organization, acting under authority of an executive board resolution. The National Organizing Committee, selected by President Murray, consisted of a chairman, assistant chairman, secretary-treasurer, and eleven other members.

In establishing that Committee, President Murray wrote:

"This Committee is authorized and directed to proceed with the organization of employees in federal, state, county, municipal and related governmental agencies. The Committee shall undertake to represent and defend the interests of these employees in the realm of collective bargaining and legislative matters in such manner as to afford them the protection and improvement to which they are entitled.

"This Committee shall prepare and promulgate rules, in accord with the CIO Constitution, for governance of Local Unions which shall affiliate with it.

"Such Committee shall be given the same status and representation on the CIO Executive Board as other affiliates of the CIO.

"The CIO shall apply such financial assistance and other aid as it shall deem necessary in connection with the organizing of said Committee.

"The Committee will be expanded as appears appropriate to provide adequate representation to affiliating groups of governmental employees.

"When the Government and Civic Employees Organizing Committee–CIO shall determine that a National Convention shall be held to set up a permanent organization and such organization is formed, the CIO shall issue a charter to such organization as a new International Union."

The rules governing the administration of the Committee and "its local bodies" were adopted at Washington, D. C., on June 17, 1950. It was provided therein that as to all matters not contained in the rules so adopted, the Constitution of the Organization shall govern. In the rules, the objects of the Committee are stated to be as follows:

"First. To unite into one organization all eligible workers and to establish as soon as economically and numerically practical an International Union of the CIO.

"Second. To increase the wages and to improve the conditions of employment of our members by legislation, negotiation or other legitimate means.

"Third. To seek the maximum job security of all members and to promote the principle of advancement and promotion based on seniority and merit.

"Fourth. To secure liberal retirement plans to be fully paid for by the employer or employing governmental body.

"Fifth. To seek extension of social security, unemployment compensation, health and welfare legislation to all American workers including governmental workers and employees of nonprofit institutions; to strive to liberalize and expand these benefits.

"Sixth. To cooperate with the Congress of Industrial Organizations and its affiliated International Unions and
• Organizing Committees to the end that all who toil shall become members of the Union of their industry for the purpose of bringing about a more secure, more abundant and happier way of life."

All individuals who become members of the local unions organized by the Committee are required to take an oath to the effect that they will observe the rules of the Committee which, as shown above, include the Constitution of the Organization.

█ We think it entirely clear that the provisions of the Solomon Bill have application to a local union sponsored and operated according to the terms and provisions of the rules of the Committee and the constitution of the Organization. Public employees, as defined in the Solomon Bill, who become members of such an operated local union are subject to the penalties therein provided. We do not understand appellant to contend to the contrary.

The record shows that the Committee organized a local union in this state. It is not identified by name or number in the record. We will sometimes refer to it as the Alabama local. Approximately 250 State employees who worked for the Board joined that local. Only one or two of them continued their membership after the passage and approval of the Solomon Bill.

Neither the Alabama local nor any of its members, past or present, are parties to this litigation, yet in reality it is that local that complainant sought to have the trial

court declare not to be a labor union or labor organization within the meaning of the Solomon Bill.

It is asserted here by the Committee, the appellant, that on the testimony of its only witness, James W. Battles, the trial court should have so decreed, irrespective of the terms and provisions of the constitution of the Organization and the rules of the Committee.

Battles was over a member of the Alabama local. He identified himself at one point in his testimony as being a "national representative of the CIO attached to the Government & Civic Employees Organizing Committee." At another point in his testimony he said that he was a staff representative assigned to the Alabama local. Apparently he was that local's guiding hand.

He testified that in June, 1953, he made an effort to negotiate with the members of the Board on behalf of certain of its employees who were then members of the Alabama local. He was unsuccessful. From that time until the passage and approval of the Solomon Bill the membership of the Alabama local remained approximately the same although, according to Battles, all efforts to bargain collectively and to negotiate with the Board were abandoned.

Thereafter, according to Battles, the Alabama local became merely a discussion group wherein the Committee sought to assist the members of the Alabama local privately and in union meetings with respect to their rights and privileges under state and federal laws and with respect to common interests involving the welfare and working conditions of the members and other citizens of the United States and with respect to public affairs, public figures, economic and political issues.

██ The constitution, rules and by-laws of a labor union or labor organization are the source of its authority. They constitute the contract between the labor union and its members, as well as the contract between members of the union. Alabama

State Federation of Labor v. McAdory, 246 Ala. 1, 18 So.2d 810. The statement of Battles to the effect that "we" abandoned the usual procedures pursued by labor organizations to accomplish their purposes is in irreconcilable conflict with the declared purpose and object of the Organization and of the Committee. The record before us fails to show any authority whatsoever whereby a local union on its own volition or upon the mere advice of a representative of the Organization may abandon the declared purposes and objects of the parent organization. Such an attempt to change the purpose of the local union appears to be subversive and prohibited by the constitution and laws of the national organization. Congress of Industrial Organizations v. City of Dallas, Tex.Civ. App., 198 S.W.2d 143; Perez v. Board of Police Com'rs of City of Los Angeles, 78 Cal.App.2d 638, 178 P.2d 537.

Moreover, there are parts of Battles' testimony which do not support his statement to the effect that after the Board refused to negotiate, the Alabama local became a mere discussion group. The following transpired during the examination of Battles:

"Q. You said when you couldn't get collective bargaining you resorted to other means that were legitimate. What do you mean by resorting to other means legitimate, toward having the wages raised? A. I see what you mean. I went there with a group of employees before the Personnel Board after that, and we did settle quite a few grievances which they had."

We are of the opinion that the decree of 3 Div. 702 should be affirmed, that is, the appeal from the final decree.

██ After the final decree was rendered the respondents gave notice of appeal from a previous decree which overruled their demurrer to the bill. That attempted appeal has been submitted here in the same record as the appeal from the final decree and has been given the number 3 Div. 702–A.

The appeal of the respondents came too late and must be dismissed. Jones v. Industrial Life & Health Ins. Co., 222 Ala. 399, 132 So. 890; 4 C.J.S., Appeal and Error, § 212, d and e, pp. 400–402. We point out, however, that in our consideration of the appeal from the final decree we indicated that the grounds of demurrer here argued by respondents below were not well taken.

The decree in 3 Div. 702 is affirmed.

The appeal in 3 Div. 702–A is dismissed.

LIVINGSTON, C. J., and STAKELY and MERRILL, JJ., concur.